FILED
2020 Oct-16  AM 09:54
U.S. DISTRICT COURT
N.D. OF ALABAMA

## UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## SOUTHERN DIVISION

| | | |
|---|---|---|
| **JAYME DAVIDSON,** | } | |
| | } | |
| **Plaintiff,** | } | |
| | } | |
| **v.** | } | **Case No.:  2:19-CV-263-RDP** |
| | } | |
| **AFFINITY HOSPITAL LLC,** | } | |
| | } | |
| **Defendant.** | } | |

## <u>MEMORANDUM OPINION</u>

In this case, Plaintiff Jayme Davidson asserts that Defendant Grandview Medical Center ("Defendant" or "Grandview")[1] discriminated against her on the basis of a disability in violation of the Americans with Disabilities Act ("ADA") and retaliated against her for exercising her rights under the Family and Medical Leave Act ("FMLA"). The case is before the court on (1) Defendant's Motion for Summary Judgment (Doc. # 39), and (2) Plaintiff's Motion to Strike (Doc. # 46). The Motions have been fully briefed, and are ripe for decision. (Docs. # 40, 47, 50, 51). For the reasons discussed below, Defendant's Motion for Summary Judgment is due to be granted, and Plaintiff's Motion to Strike is due to be denied.

## I.      Background[2]

Defendant operates an acute care hospital located in Birmingham, Alabama. (Doc. # 1 at ¶ 7; Doc. # 11 at ¶ 7).  Plaintiff worked for Defendant's predecessors since 1997. (Doc. # 1 at ¶ 12).

---

[1] Defendant is Affinity Hospital, LLC d/b/a Grandview Medical Center.

[2] The facts set out in this opinion are gleaned from the parties' submissions and the court's own examination of the evidentiary record. All reasonable doubts about the facts have been resolved in favor of the nonmoving party. *See Info. Sys. & Networks Corp. v. City of Atlanta*, 281 F.3d 1220, 1224 (11th Cir. 2002). These are the "facts" for summary judgment purposes only. They may not be the actual facts that could be established through live testimony at trial. *See Cox v. Adm'r U.S. Steel & Carnegie Pension Fund*, 17 F.3d 1386, 1400 (11th Cir. 1994).

In 2007, Grandview promoted Plaintiff to lead social worker. (Doc. # 1 at ¶ 14). Plaintiff was the only Lead Social Worker at Grandview. (Doc. # 41-3 at 59-60).

Defendant has an Employee Handbook which included policies addressing, among other subjects, Employment-at-Will, the Family Medical Leave Act, Equal Employment Opportunity and Anti-Harassment, Progressive Discipline, and Grievance Resolution. (Doc. # 41-2 at 51-57, Doc. # 41-2 at 94-107). Plaintiff received a copy of the Employee Handbook in 2009, and again on July 9, 2016. (Doc. # 41-2 at 57-58, Doc. # 41-2 at 106-07).

Defendant's Disciplinary Action policy states that "disciplinary action may take the form of counseling, separation of employment, written warnings, suspension, or verbal warnings," and that Defendant "reserves the right to take the corrective action it deems appropriate in any given situation, up to and including separation." (Doc. # 41-2 at 55, Doc. # 41-2 at 101).

Grandview outsources the management of FMLA leave for employees to FMLA Source, and FMLA Source makes the decision whether to approve or deny FMLA requests. (Doc. # 41-5 at 19-20; Doc. # 41-2 at 105-6).

In October 2015, Defendant moved its physical location to its current location on Highway 280, which is a larger facility, but has fewer licensed beds. (Doc. # 41-1 at 34-35[3]; Doc. # 41-2 at 213-215). Defendant's social workers were typically assigned one floor of 50 beds, plus up to 24 beds on an ICU floor. (Doc. # 41-3 at 28). If a social worker was absent, her assignments were divided up among the other social workers. (Doc. # 41-3 at 29-31). Depending on the day,

---

[3] Due to the manner in which Defendant's evidentiary submission was filed in this case -- depositions and related exhibits were filed within one CM/ECF document -- there are frequently two citations to the same CM/ECF document following each other. (*e.g.* (Doc. # 41-2 at 57-58, Doc. # 41-2 at 106-07)). Citations to depositions are made to the deposition page number. Citations to exhibits are made to the specific CM/ECF page number of the relevant exhibit.

sometimes no patients were assigned to a bed, and at other times more than one patient was assigned to a bed. (*Id.*).

Case managers assisted social workers with discharge planning. (Doc. # 41-3 at 40). If Plaintiff was absent for a short period, the case managers on her floor would help cover her beds. (Doc. # 41-3 at104). If Plaintiff missed work for a longer period, or a case involved more complex social work issues, her assigned beds would be divided up among the other social workers. (Doc. # 41-3 at 83, 87-88, 104). Working for Defendant as a social worker was a fast-paced job and could be stressful. (Doc. # 41-3 at 32; Doc. # 41-2 at 247).

During the relevant time frame (2015 to 2017), Plaintiff's primary responsibilities as a social worker were case management and discharge planning. (Doc. # 41-2 at 40-41). Plaintiff worked primarily on the 7th floor, which is Defendant's cardiology floor. (*Id.*). Plaintiff was responsible for coordinating any post-discharge needs, such as medical equipment, rehabilitation services, or a transfer to another facility. (Doc. # 41-2 at 41-42). Together with the patient, the patient's family, the patient's physician, and the RN case manager, Plaintiff helped develop a discharge plan. (Doc. # 41-2 at 42:7-23.)

Plaintiff reported to Cindy Watson, the Director of Case Management, until Watson left Grandview on August 4, 2017. (Doc. # 41-2 at 44-46; Doc. # 41-1 at 263-65). Thereafter, Plaintiff reported to Kim Colvert, the interim Director of Case Management. (Doc. # 41-3 at 20; Doc. # 41-2 at 188). Watson and Colvert in turn reported to Julie Soekoro, the Chief Financial Officer ("CFO"). (Doc. # 41-1 at 34:11 – 35:3; Doc. # 41-3 at 55-56; Doc. # 41-5 at 13). Jeri Wink, Human Resources ("HR") Director, provided human resources services and support. (*Id.*).

Plaintiff is partially deaf and, as of May 2015, had a 35% hearing loss in both ears. (Doc. # 48-4 at 21-29). In May 2015, Plaintiff requested that Defendant purchase hearing aids for her due to her hearing loss. (Doc. # 41-2 at 75-76, Doc. # 41-2 at 109-126; Doc. # 41-7 at 19-23). Plaintiff's request was denied. (Doc. # 41-5 at 20-22). Defendant believed it did not have a legal obligation to provide the hearing aids because they were personal items that could be used by Plaintiff both at home and at work. (*Id.*). In her appeal of that denial, Plaintiff indicated that she was concerned her hearing loss was affecting her job performance. (Doc. # 41-2 at 75-76, 80-83, Doc. # 41-2 at 118-19; Doc. # 41-5 at 23-24, 28-29). On May 29, 2015, Plaintiff was advised that her appeal had been denied. (Doc. # 41-2 at 75-76, 80-83, Doc. # 41-2 at 118-19; Doc. # 41-5 at 23-24, 28-29).

On several occasions (after her initial request that Grandview purchase hearing aids for her had been denied), Grandview discussed with Plaintiff options to assist with her hearing loss, such as obtaining a headset or listening devices to use with the phone, sitting closer to the phone in meetings, asking her doctor for suggestions, and using her health savings account or bonus to help with the purchase of hearing aids. (Doc. # 41-5 at 38-41, 80, 83, 163; Doc. # 41-5 at 88-95, 102; Doc. # 41-1 at 143-45).

On Plaintiff's annual evaluation prepared in July 2015, Watson rated Plaintiff as "meets" or "exceeds' requirements in all areas. (Doc. # 48-1 at 32-38).

On May 18, 2016, an issue arose between Plaintiff and Tomi Williams, another social worker, about something that had not been done relating to a patient. (Doc. # 41-1 at 181-84; Doc. # 41-1 at 137-38; Doc. # 41-2 131-36). Watson, in her capacity as Director of Case Management, counseled both Plaintiff and Williams regarding this issue and instructed both of them to

communicate professionally and factually with each other. (Doc. # 41-1 at 181-84; Doc. # 41-1 at 137-38; Doc. # 41-2 131-36).

Also on May 18, 2016, Megan Lotero, the Nurse Manager on the cardiac floor, informed Watson of a complaint she had received from a patient's family indicating that Plaintiff had been rude to them. (Doc. # 41-1 at 324; Doc. # 41-1 at 129). Watson counseled Plaintiff about the perceived rudeness. (Doc. # 41-1 at 324; Doc. # 41-1 at 129; Doc. # 41-2 at 129-31).

On Plaintiff's annual evaluation prepared in July 2016, Watson rated Plaintiff as "meets" or "exceeds" requirements or "distinguished" in all but one area, where she was rated "unacceptable." (Doc. # 48-1 at 54-73).

In August 2016, employees who worked with Plaintiff were aware that she was having some gastrointestinal issues. (Doc. # 41-3 at 83-84). However, it was not until August 23, 2016, that they became aware of the extent of those issues, and that they might be caused by clostridium difficile ("C-Diff"). (Doc. # 41-3 at 83-85; Doc. # 48-12 at 2).

On August 23, 2016, Lotero informed Watson of another patient complaint that Plaintiff was rude. (Doc. # 41-2 at 136-38; Doc. # 41-1 at 199). On August 26, 2016, Watson counseled Plaintiff about customer perception and having compassion for that particular patient – who had just received a terminal diagnosis. (Doc. # 41-1 at 88-90; Doc. # 41-2 at 136-38; Doc. # 41-2 at 199).

On September 11, 2016, Plaintiff applied for leave under the FMLA due to her own serious health condition, C-Diff. (Doc. # 41-2 at 104-6, 108; Doc. # 41-2 at 149). Plaintiff requested and received FMLA leave for her C-Diff condition for the following periods of time: (1) September 6 through September 18, 2016; (2) October 20 through November 1, 2016; (3) November 14 through

November 29, 2016; and (4) December 14, 2016 through January 12, 2017. (Doc. # 41-2 at 172-176). A request for leave for November 2, 2016 was denied due to a lack of certification of the need for leave for that particular date. (Doc. # 41-2 at 108-116; Doc. # 41-2 at 172-176).

Plaintiff provided Defendant a FMLA Certification of Employee's Fitness for Duty form dated November 29, 2016, and a doctor's note indicating that she could return to work on November 30, 2016. (Doc. # 41-1 at 112-16; Doc. # 41-1 at 134-35). The note stated that she should not "enter a room of a patient on contact isolation." (*Id.*). Plaintiff returned to work on November 30, 2016. (*Id.*).

On December 14, 2016, Plaintiff requested FMLA leave again for the period of December 14, 2016 through January 24, 2016, and FMLA Source approved her request. (Doc. # 41-2 at 172; Doc. # 41-7 at 25). On January 13, 2017, Plaintiff returned to work early from FMLA leave. (Doc. # 41-7 at 15).

On January 20, 2017, Plaintiff submitted a Request for Accommodation asking that she not be required to be in the room with patients with possible C-Diff infection, and that "contact [with] those patients with possible C. Diff infection be via telephone." (Doc. # 48-7 at 59; Doc. # 41-2 at 91-96; Doc. # 41-2 at 175, 179; Doc. # 41-7 at 15). Plaintiff also submitted a letter from Dr. Carnes, who had been treating her for the C-Diff., recommending that "she avoid all patient interaction with those who may have this [C-Diff] infection and would be best avoiding the inpatient hospital setting." (Doc. # 48-7 at 60).

On January 26, 2017, Plaintiff requested worker's compensation coverage since she believed she had contracted C-Diff. in the workplace. (Doc. #  48-11 at ¶ 28). Defendant investigated that claim. (Doc. # 48-7 at 71).

6

On February 14, 2017, Gretchen Cassavoy, the Assistant Director on the cardiac floor, received two complaints from patients about Plaintiff. (Doc. # 41-2 at 201). The first complaint asserted that Plaintiff had not followed up with a patient regarding the patient's home health care choice. (Doc. # 41-2 at 201). The second complaint reported that Plaintiff had only met with the patient and family once about discharge planning, was condescending, and had failed to give them any choice with regard to home health care companies. (Doc. # 41-2 at 201). Cassavoy reported the complaints to Watson at 10:51 a.m. on February 14, 2017. (*Id.*: Doc. # 48-10 at 22). Plaintiff received a documented verbal counseling as a result of these two complaints as well as a physician complaint which reported that Plaintiff had exhibited a lack of responsiveness and dismissive behavior. (Doc. # 41-2 at 138-43; Doc. # 41-2 at 200-201; Doc. # 41-1 at 218-20, 225-27, 333-34; Doc. # 41-1 at 140-43).

At 2:23 p.m. on February 14, 2017, Plaintiff e-mailed Watson stating "I don't know what has happened but this place seems to be so hostile these days. It is very uncomfortable. Jayme." (Doc. # 41-1 at 224; Doc. # 41-2 at 143).

On February 15, 2017, Plaintiff e-mailed Wink asking whether her January 2017 request for accommodation of her C-Diff. condition was approved. (Doc. # 41-5 at 123). Wink responded that Plaintiff "would not be required to enter a patient's room who knowingly has C. Diff until your physician no longer feels this is an issue or unless it becomes burdensome and we are unable to accommodate." (Doc. # 41-2 at 95-99; Doc. # 41-5 at 211-12; Doc. # 41-5 at 123).

On March 1, 2017, Plaintiff fell at work and hurt her ankle. (Doc. # 41-2 at 99-102; Doc. # 41-1 at 230-31; Doc. # 41-1 at 143-51). Plaintiff did not see a doctor initially, and continued to work until the afternoon of March 8, 2017, when she saw Dr. Baquaddin about the ankle. (Doc. #

41-1 at 232-35; Doc. # 41-1 at 152-53; Doc. # 41-5 at 149-50; Doc. # 41-7 at ¶ 10, 27-32). Dr. Baquaddin prescribed no walking, and referred Plaintiff to an orthopedic surgeon and for physical therapy. (*Id*.).

On March 9, 2017, Dr. Kenneth Murray complained to Watson about Plaintiff's conduct on March 8, 2017, involving a perceived lack of communication with him and with a family regarding a discharge plan. (Doc. # 41-1 at 235-36; Doc. # 41-2 at 204).

On March 10, 2017, Plaintiff was seen by an orthopedic surgeon, who ordered an MRI. (Doc. # 41-5 at 151, Ex. 51; Doc. # 41-7 at ¶ 11, 28-29). Plaintiff was released to return to work on March 13, 2017 with her ankle/foot in a walking boot. (*Id*.).

At some point during the spring of 2017, Plaintiff purchased hearing aids for herself. (Doc. # 41-2 at 61-62). On March 13, 2017, Plaintiff emailed Watson stating, "My hearing aids are working!" (Doc. # 41-5 at 152-53; Doc. # 41-5 at 100; Doc. # 41-2 at 251).

On March 15, 2017, Plaintiff received a written warning for substandard work based on Dr. Murray's March 9 complaint about her lack of communication on March 8, 2017. (Doc. # 41-2 at 147–155; Doc. # 41-2 at 203; Doc. # 41-1 at 235-36, 240-42, 245-46, 251-54, 344-45; Doc. # 41-1 at 154-57). Plaintiff noted her disagreement with the counseling on the Counseling Notice. (Doc. # 41-2 at 203). Plaintiff also e-mailed Wink, "I feel as if I am being targeted or singled out because of my health issues in the past six months or so. I have just worked very hard for this company for nearly 20 years now with no disciplinary action and all good annual reviews . . ." (Doc. # 48-4 at 7). Wink did not respond in writing, but in a meeting with Plaintiff, she explained that Plaintiff's "[d]isciplinary actions have nothing to do with being targeted or singled out because of her health issues." (Doc. # 41-5 at 153-54).

8

On April 26, 2017, Plaintiff e-mailed Wink: "I was just wondering if you had any luck finding out anything about any available assisted devices/resources. I am still having trouble hearing people on the telephone." (Doc. # 48-8 at 13). Wink responded by inviting Plaintiff to "stop by HR to discuss in more detail." (*Id.*).

On May 8, 2017, Plaintiff had surgery on her ankle. (Doc. # 41-2 at 117). On May 31, 2017, while she was still recovering from her May 8, 2017 surgery, Plaintiff filed a workers' compensation lawsuit against Grandview concerning her March 1, 2017 ankle injury and her alleged exposure to C-Diff at work. (Doc. # 41-8).

On June 7, 2017, Plaintiff requested FMLA leave related to her ankle for the dates of March 1, 2017 to June 23, 2017. (Doc. # 41-2 at 182-89). On June 21, 2017, FMLA Source sent Plaintiff a letter regarding her requests for leave. (Doc. # 41-2 at 117-18; Doc. # 41-2 at 182; Doc. # 41-5 at 165; Doc. 41-5 at 103-04). That letter informed Plaintiff: (1) that her leave from March 1, 2017 to May 20, 2017 was denied for insufficient notice of the need for leave; (2) her leave from May 21, 2017 to May 30, 2017 was granted; (3) her FMLA exhausted on May 30, 2017; and (4) her request for FMLA leave from May 31, 2017 to June 23, 2017 was denied because she had exhausted her FMLA leave and/or the requested leave dates had not been certified by her physician. (Doc. # 41-2 at 178-79). Although Plaintiff's FMLA leave was exhausted as of May 30, 2017, she remained out of work because of her ankle injury on personal leave until June 19, 2017. (Doc. # 41-2 at 117-18; Doc. # 41-2 at 182; Doc. # 41-5 at 165; Doc. 41-5 at 103-04)

On June 19, 2017, Plaintiff returned to work under her doctor's orders to perform "light work," to use a knee scooter as needed; she resumed her full job duties. (Doc. # 41-1 at 351-52; Doc. # 41-5 at 170-73; Doc. # 41-5 at 103-04). Plaintiff had frequent doctor's appointments during

business hours for her foot/ankle injury and related physical therapy. (Doc. # 41-3 at 76; Doc. # 48-12 at 15-19, 22, 24-25, 28-29, 36, 38).

On July 3, 2017, Colvert e-mailed Watson to tell her to direct Plaintiff to try and schedule her doctor's appointments after 3:00 p.m. (Doc. # 41-3 at 106-08; Doc. # 48-12 at 19). During this period of time, the social work department was understaffed. (Doc. # 41-3 at 88-89).

On July 10, 2017, Wink and Tammy McMichael (Employee Health Nurse) met with Plaintiff. (Doc. # 41-1 at 162). They discussed complaints from Plaintiff's co-workers that her discussion of her pending workers' compensation lawsuit and medical conditions made them uncomfortable and they advised Plaintiff that she needed to refrain from such conversations at work. (*Id.*). During this meeting, Plaintiff was also advised that she needed to try and schedule her doctor's and physical therapy appointments after work hours to accommodate the workload. (Doc. # 41-5 at 175-76; Doc. # 41-5 at 105; Doc. # 41-1 at 279-81; Doc. # 41-1 at 162).

On July 17, 2017, Brad Batte, RN Cardiac Unit Director, complained to Watson regarding substandard discharge planning a family received from Plaintiff. (Doc. # 41-1 at 284-85; Doc, # 41-1 at 164).

On July 20, 2017, Ashley Boler, a certified registered nurse practitioner, also complained to Watson about "gaps and lack of documentation in the medical record as to the discharge plan" regarding a patient that Plaintiff was responsible for that resulted in a 9-day delay in discharge. (Doc. # 41-1 at 166). Boler reported that Plaintiff was not responsive, failed to communicate, has to be babysat, and exhibited slurred speech. (*Id.*).

On July 24, 2017, based on the complaints she received from Batte and Boler, Watson issued Plaintiff a second written warning for substandard work. (Doc. # 41-1 at 284-85; Doc. # 41-

1 at 163-66; Doc. # 41-5 at 129-30). The July 24, 2017 second written warning was a final written warning. (Doc. # 41-1 at 163; Doc. # 41-5 at 215, 235-36).

On July 25, 2017, at 6:19 p.m., Plaintiff notified Wink, Colvert and Watson via e-mail that a doctor's appointment had been changed. (Doc. # 48-8 at 41-42). Wink responded, "[t]hanks for the update Jayme. Hopefully we can meet with you tomorrow regarding the proposed job change that will hopefully be a much better opportunity for you." (Doc. # 48-8 at 41-42). Plaintiff replied to all, "I am more than willing to hear what you propose but would prefer it be presented in writing first so I can consult with my attorney as as [sic] the meetings are becoming too tense and I feel at a disadvantage." (*Id.*). Colvert responded privately to Watson, "For heaven's sake . . . ." (*Id.*). Watson responded to Colvert, "But seriously . . . ." (*Id.*)

On July 26,  at 8:40 a.m., Watson responded to Plaintiff's July 25 e-mail. (Doc. # 48-12 at 24) Watson stated:

> Shayne is schedule off that day and you are already scheduled late that morning for an appointment with Dr. Cowley at 0845. Based on staffing needs, you will need to return to work following you[sic] afternoon appointment scheduled at 1:30. Fridays are typically a high volume dc day and we will be 2 sw down that day already. Thanks!

(Doc. # 48-12 at 24).

On July 27, 2017, Plaintiff again e-mailed Wink, Colvert and Watson saying "Jeri Wink is the only person to respond to my email earlier this week. I have a WC appt with Dr. Cowley at 8:30 and one with Dr. Carnes at 1:00 tomorrow." (Doc. # 48-12 at 25). Watson replied on July 27, 2017:

> I responded yesterday that we have additional SW off Friday and are already down a position so you will need to come eraly [sic] prior to your am appointment and return after your afternoon appointment to complete your assignment and additional

coverage assignment. Staffing is very tight tomorrow and is typically a high volume dc day.

(Doc. # 48-12 at 25).

On July 28, 2017 at 10:49 a.m. Shannon Abrams e-mailed the case management group with the subject "Social Worker Needed." (Doc. # 48-12 at 26). Abrams stated: "HELP!! All, It appears that Jayme will not be coming back today and we have pending SNF's that need levels. . . ." (Doc. # 48-12 at 26). At 5:07 p.m. that day, Watson forwarded Abrams's e-mail to Colvert asking: "Did she not come back after her a.m. appointment? Furthermore, why would levels not already be fine? I'm so tired of this crap." (Doc. # 41-1 at 274-75; Doc. # 48-12 at 26).

On July 28, 2017 at 5:11 p.m., Colvert e-mailed Watson:

I received a call from Jayme at 9:54. She stated that she had to go get an MRI and be fitted for compression hose. She said she was doing the best she can and then started crying. Darlene said she came back to her office about 10:30, shut down her computer and left without saying anything to anyone. She did not return after her 1:30 appointment.

(Doc. # 41-1 at 277-79; Doc. # 48-12 at 27).  Watson responded, "I am screaming out loud. So over this." (*Id.*) (emphasis added).

On July 31, 2017, Plaintiff responded to Abrams and the case management group:

I'm sorry about Friday. I came in at 5:00 am but did not plan all the things Dr. Cowley ordered such as an MRI and then I had to have blood work and other issues at Dr. Carnes. I did not get finished until 4:30 which made it a very long day. Please forgive me. Jayme.

(Doc. # 45-36 at 3).

On August 4, 2017, Watson left her position as Director of Case Management after a discussion with Soekoro and Wink about the case management department's performance and the need to go in a different direction. (Doc. # 41-6 at 13-21, 93-94; Doc. # 41-1 at 270-71; Doc. # 41-

12

1 at 160; Doc. # 41-5 at 182-84). Thereafter, Colvert became the Interim Director of Case Management. (Doc. # 41-2 at 20).

On August 24, 2017, Plaintiff had a second surgery on her ankle. (Doc. # 41-5 at 190-93, 202-04; Doc. # 41-5 at 108-117, 121-122; Doc. # 41-2 at 125-27;  Doc. # 41-2 at 193-94; Doc. # 41-7 at 30). Because Plaintiff had no remaining FMLA leave available to her, she was placed on a personal leave of absence from August 24, 2017 to October 23, 2017. (*Id.*).

While Plaintiff was out on personal leave, Defendant hired two social workers. (Doc. # 41-3 at 89-93). These social workers were finishing their six to seven week orientation about the time that Plaintiff was due to return to work in October. (*Id.*).

On October 13, 2017, Wink sent Plaintiff a letter regarding a number of matters. (Doc. # 48-8 at 65-66). The letter noted that Plaintiff had erroneously received an overpayment because she had received her regular pay in addition to worker's compensation while on leave. (*Id.*). The letter also advised Plaintiff that, because she had exhausted her FMLA leave, she had been placed on a personal leave of absence effective August 24, 2017. (Doc. # 41-5 at 202-04:7; Doc. # 41-5 at 193-94; Doc. # 41-2 at 125-27). Wink noted that there was no guarantee of reemployment on return from a personal leave of absence. (*Id.*). She also informed Plaintiff that her personal leave had been approved through October 23, 2017, when she was scheduled for a follow-up appointment with her physician, and that if she needed an extension of her personal leave, she should contact Human Resources immediately following the October 23, 2017 appointment. (*Id.*).

Darlene Holcomb and Shannon Abrams, the Case Managers on the 7th floor, told Colvert that they did not want to work with Plaintiff anymore because they felt like they had to pull a lot of her load. (Doc. # 41-3 at 181-82; Doc. # 41-6 at 61-62). At that point, Holcomb and Abrams

knew Plaintiff had filed a lawsuit against Defendant and they felt that they had to be careful what they said to her for fear it would be taken out of context. (*Id.*). On October 17, 2017, Colvert e-mailed Wink about moving Plaintiff to another floor upon her return. (Doc. # 48-10 at 4). Colvert stated that "If I do change the location, it will be very apparent if she is not performing her job as she should be. Will we then go through the disciplinary steps, i.e. verbal & written warnings?" (*Id.*).

On October 20, 2017, Wink e-mailed Colvert with the subject "email" in which she suggested "Let's discuss in person. Certain things don't need to be mentioned in email (everything is discoverable) and we have to be careful how certain comments can be interpreted." (Doc. # 48-8 at 61). Colvert responded, in part, "Can I come talk to you about this Monday? If Jayme comes back Tuesday, we would like to make that transition then." (*Id.*; Doc. # 41-5 at 196-97, 204-05, 214-15).

Plaintiff was released by her doctor to return to work on October 24, 2017 without any restrictions regarding her ankle. (Doc. # 41-2 at 123-24:8; Doc. # 41-2 at 190; Doc. # 41-5 at 195-96). On October 23, 2017, Plaintiff e-mailed Wink, Soekoro, McMichael, and Colvert and stated, in relevant part, "I have been released to return to work.[] I will be at work in the morning. [] I have no restrictions for my ankle injury but will have four more weeks of PT to continue strengthening." (Doc. # 48-12 at 48).

When Plaintiff returned to work, she was moved from the 7th to the 9th floor, a medical/surgery unit. (Doc. # 41-5 at 186-89, 194-97; Doc. # 41-5 at 106-07, 117-18; Doc. # 41-3 at 179-82, Ex. 35; Doc. # 41-6 at 60-61; Doc. # 41-6 at 45-46). Plaintiff's move to the 9th floor did not change her job duties, pay, or benefits. (Doc. # 41-2 at 187-88).

14

On October 25, 2017, Plaintiff had a twenty-five minute meeting with Michael Dean, the Director of the Short Stay Unit on the 9th floor, and other staff members in his office. (Doc. # 48-11 at ¶ 54). There were only two chairs in the room. (*Id.*). Davidson asked if she could have a chair because she needed to sit down due to her ankle injury. (Doc. # 41-2 at 205; Doc. # 41-7 at 233).

On October 26, 2017, Rick Smith, a patient's son, was upset about what he perceived as a lack of help from Plaintiff regarding the plan for his mother's discharge from the hospital to a nursing facility. (Doc. # 41-9 at ¶ 6; Doc. # 41-10 ¶ 6). Smith spoke with Jennifer Perrigin, the Charge Nurse on the 9th floor, and informed Perrigin that Plaintiff was not focusing on his mother's situation, but instead was talking about herself, her medical problems, and her problems with Grandview. (Doc. # 41-9 at ¶ 6). Smith asked Perrigin whether there was anyone else that he could talk to because he did not want to deal with Plaintiff anymore. (*Id.*). Perrigin reported the incident to Dean. (Doc. # 41-10 at  ¶ 6).

Perrigin also reported to Dean that Plaintiff had told her that she had sued Grandview, that she had a lawyer, that she was not happy about being on the 9th floor, and that she had medical issues. (Doc. # 41-9 at 3). Perrigin informed Dean of these comments because they made her feel uncomfortable and did not foster a good working environment. (*Id.*)

Dean spoke with the patient's son, Rick Smith, who told Dean that: (1) Plaintiff did not seem concerned about his mother, but instead told him about her personal medical issues; (2) of the 30 minutes Plaintiff had spent in his mother's room, 25 of those minutes were devoted to talking about herself and her medical problems; and (3) he did not feel that Plaintiff had listened to anything he said concerning his mother's situation because she was busy discussing her personal life, including her health issues. (Doc. # 41-10 at ¶¶ 6-7, p. 6). After Dean's meeting with Smith,

at 10:47 a.m. on October 26, 2017, Dean e-mailed Colvert summarizing Smith's complaint.  (Doc. # 41-10 at ¶¶ 7-8, p. 6; Doc. # 41-6 at 66; Doc. # 41-6 at 47). Colvert forwarded the e-mail to Wink and Soekoro stating "[i]t's already started. Please advise." (Doc. # 45-43 at 1).

At 11:34 a.m. on October 26, 2017, Soekoro forwarded Dean's e-mail to Wink and Colvert stating that Plaintiff's conduct that day "warrants disciplinary action and is clearly HIGHLY inappropriate and unprofessional, not to mention misuse of company resources as we are paying her for the 30 minutes she spent as described below." (Doc. # 41-6 at 66, 69; Doc. # 41-6 at 47-49). Soekoro asked Wink to get with Colvert and address these issues with Plaintiff. (*Id*.). Soekoro also told Dean that "we will address through the appropriate HR processes. Thank you for bringing this to our attention." (Doc. # 41-6 at 47).

At 12:32 p.m. on October 26, 2017, Dean sent a follow-up e-mail to Colvert, Callis, and Soekoro stating that Plaintiff was "sharing with staff that she has law suits against the hospital," that "the hospital tried to get rid of her and that she got kicked off 7th floor because they didn't like her." (Doc. # 41-10 at ¶ 9, p. 7; Doc. # 41-6 at 69-71; Doc. # 41-6 at 50). Dean reported that Plaintiff had told him this on October 25, 2017, that she had also shared this information with his staff, and that he found it "very concerning," and thought they should know. (*Id*.). At 2:21 p.m. on October 26, 2017, after receiving Dean's second e-mail, Soekoro e-mailed Wink, Colvert, and Callis and stated "Write up #2 today. Michael Dean and his charge nurse apparently heard far more than was appropriate or solicited." (Doc. # 41-6 at 69-72; Doc. # 41-6 at 50-52).

The next morning, at 9:13 a.m. on October 27, 2017, Plaintiff e-mailed Callis asking what Smith was upset about. (Doc. # 41-6 at 72-73; Doc. # 41-6 at 53-54). Callis responded at 9:17 a.m. that they needed to sit down and discuss the situation. (*Id*.). At 9:26 a.m., Plaintiff responded that

she "would like to talk with (patient's) son or have him present because I am not getting railroaded again. I did nothing but help the man yesterday all day." (Doc. # 41-6 at 53-54; Doc. # 41-2 at 199-200; Doc. # 41-2 at 207-212). At 9:31 a.m., before a manager could respond to Plaintiff's 9:26 a.m. e-mail, Plaintiff e-mailed Colvert, Callis, and Wink and stated that she "just spoke[n] with Rick Smith, pts son and he said that he has no complaints regarding my discharge planning with him." (Doc. # 41-2 at 199-204; Doc. # 41-2 at 207-212; Doc. # 41-6 at 72-73:14; Doc. # 41-6 at 53-54).

Later that same morning, Dean reported to Soekoro and others that Smith had told him that Plaintiff had called him that morning on his cell phone and asked him why he was mad at her. (Doc. # 41-10 at ¶ 10, p. 10; Doc. # 41-6 at 75-76:16; Doc. # 41-6 at 55). Smith reported that Plaintiff was irrational in her behavior and tone, and that he wanted to get his mother discharged as soon as possible. (*Id.*).

On October 27, 2017, Soekoro met with Wink and Drew Mason, Grandview's CEO, about Plaintiff. (Doc. # 41-6 at 78-80; Doc.41-6 at 48-50, 56; Doc. # 41-5 at 200-01, 235-36). Soekoro's assessment was that Plaintiff's behavior was highly inappropriate and unprofessional, and that based on the complaints, she did not need to be employed at Grandview anymore. (Doc. # 41-6 at 78-80; Doc.41-6 at 48-50, 56; Doc. # 41-5 at 200-01; 235-36). Because Plaintiff's earlier, July 24, 2017 second written warning had been a final written warning, the next disciplinary step for Plaintiff would result in termination under Grandview's progressive discipline policy. (Doc. # 41-1 at 163; Doc. # 41-5 at 215, 235-36). At the October 27, 2017 meeting between Wink, Soekoro, and Mason, the decision was made to terminate Plaintiff's employment. (Doc. # 41-6 at 69-71, 78-80; Doc. # 41-5 at 235-36).

On October 30, 2017, Wink and Colvert met with Plaintiff and advised her that her employment was being terminated. (Doc. # 41-5 at 215; Doc. # 41-5 at 124; Doc. # 41-3 at 221-22; Doc. # 41-2 at 188). The Employee Counseling/Disciplinary Action Notice concerning Plaintiff's termination stated the following:

> 10_26_17 Patient Family Complaint. Jayme spent 25 minutes of her 30 minute meeting with them talking about her own medical issues on the d c plan for the patient. When this was brought to Jayme's attention (10_27_17) she sent an email indicating she wanted the family member present in her discussion but before we could respond she took it upon herself to call the family member. The family member reported that she called asking why he was mad at her. He said she was irrational in her behavior and tone. Lastly, it was communicated on July 10, 2017 to Jayme to not discuss her lawsuit and medical condition to co-workers as it makes employees uncomfortable and last week she mentioned to a charge nurse and a director about her lawsuit and work comp issues.

(Doc. # 41-5 at 124).

On October 30, 2017, Darlene Holcomb e-mailed Colvert:

> While working with Jayme on 7th Cardiac, she had difficulty communicating with patient, pt family members, staff & MD's. She did not handle the stress of the floor very well. She often was overwhelmed with the case load. She was easily frustrated.

(Doc. # 48-10 at 13). On October 31, 2017, Colvert forwarded Holcomb's e-mail to Wink and wrote: "Is this what you are looking for?' (*Id*.).

From 2015 to 2017, other employees in the case management department, besides Plaintiff, took FMLA leave, including Colvert (2015 into January 2016), Marie Campbell (2015), Ramona Yarbrough (2015 into January 2016), Teresa Blocker (2015, 2017), and Jennifer Canon Locke (2017). (Doc. # 41-7 at ¶ 6.) Other than Plaintiff, none of these employees have been involuntarily terminated by Defendant. (Doc. # 41-7 at ¶ 6.)

From 2015 to 2017, the following other employees in the case management department were involuntarily terminated: Franketta Mumford, social worker, was terminated on April 8, 2016

for an expired license; Rachel Graffeo, social worker, was terminated on October 13, 2017 for a policy violation; and Sandra Cams, case manager, was terminated on November 1, 2017 for a policy violation. (Doc. # 41-7 at ¶ 7.) Defendant has no record of any of these employees ever taking FMLA leave. (Doc. # 41-7 at ¶ 7).

On April 26, 2018, 178 days after her employment was terminated, Plaintiff filed an EEOC Charge and checked the disability and retaliation boxes. (Doc. # 1-1). The EEOC issued a Dismissal and Notice of Rights on Plaintiff's Charge on November 12, 2018. (Doc. # 1-2). Plaintiff's Complaint was filed on February 13, 2019. (Doc. # 1).

## II.    Plaintiff's Motion to Strike

Plaintiff has moved to strike portions of the declarations of Jennifer Perrigin and Michael Dean. (Doc. # 46). Defendant has responded to the Motion. (Doc. # 50). Plaintiff did not file a reply in support of her Motion.

Federal Rule of Civil Procedure 56(c)(4) details the requirements for affidavits or declarations used to in relation to a motion for summary judgment. Declarations are permissible when they are made based on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant is competent to testify to the matters stated therein. *See* Fed. R. Civ. P. 56(c)(4). At the summary judgment stage, "a court may only consider evidence that is admissible or that could be presented in admissible form." *Rowell v. Bellsouth Corp*., 433 F.3d 794, 800 (11th Cir. 2005) ("On motions for summary judgment, we may consider only that evidence which can be reduced to an admissible form."). It is only the content or substance of the evidence that must be reduced to an admissible form, not the affidavit itself. *See, e.g., Argo v. Blue Cross & Blue Shield of Kan., Inc*., 452 F.3d 1193, 1199 (10th Cir. 2006) ("Parties may submit

19

affidavits in support of summary judgment, despite fact that affidavits are often inadmissible at trial as hearsay, on theory that the evidence may ultimately be presented at trial in an admissible form.").

Here, the declarations of Perrigin and Dean were proffered as evidence of Defendant's reasons for taking certain actions against Plaintiff, rather than for the truth of the matters asserted. *Goode v. Wild Wing Cafe*, 588 F. App'x 870, 875 (11th Cir. 2014) (citing *See* Fed.R.Evid. 801(c) (defining "hearsay" as a statement used to "prove the truth of the matter asserted")). "'It is well settled in employment discrimination cases [] that for an employer to prevail the [fact finder] need not determine that the employer was correct in its assessment of the employee's performance; it need only determine that the defendant in good faith believed plaintiff's performance to be unsatisfactory and that the asserted reason for the discharge is therefore not a mere pretext for discrimination.'" *Goode*, 588 F. App'x at 875 (quoting *Moore v. Sears, Roebuck & Co.*, 683 F.2d 1321, 1323 n. 4 (11th Cir. 1982)).

Here, not only are the challenged statements not hearsay because they are not offered for the truth of the matter asserted, but, in any event, they are capable of being reduced to an admissible form at trial. Therefore, Plaintiff's Motion to Strike Portions of the Declarations of Jennifer Perrigin and Michael Dean (Doc. # 46) is due to be denied.

## III.   Standard of Review

Under Federal Rule of Civil Procedure 56, summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). The party asking

for summary judgment always bears the initial responsibility of informing the court of the basis for its motion and identifying those portions of the pleadings or filings which it believes demonstrate the absence of a genuine issue of material fact. *Id.* at 323. Once the moving party has met its burden, Rule 56 requires the non-moving party to go beyond the pleadings and -- by pointing to affidavits, or depositions, answers to interrogatories, and/or admissions on file -- designate specific facts showing that there is a genuine issue for trial. *Id.* at 324.

The substantive law will identify which facts are material and which are irrelevant. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986) ("*Anderson*"). All reasonable doubts about the facts and all justifiable inferences are resolved in favor of the non-movant. *See Allen v. Bd. of Pub. Educ. for Bibb Cty.*, 495 F.3d 1306, 1314 (11th Cir. 2007); *Fitzpatrick v. City of Atlanta*, 2 F.3d 1112, 1115 (11th Cir. 1993). A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248. If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted. *See id.* at 249.

When faced with a "properly supported motion for summary judgment, [the nonmoving party] must come forward with specific factual evidence, presenting more than mere allegations." *Gargiulo v. G.M. Sales, Inc.*, 131 F.3d 995, 999 (11th Cir. 1997). As *Anderson* teaches, under Rule 56(c) a plaintiff may not simply rest on his allegations made in the complaint; instead, as the party bearing the burden of proof at trial, he must come forward with at least some evidence to support each element essential to his case at trial. *See Anderson*, 477 U.S. at 252. "[A] party opposing a properly supported motion for summary judgment 'may not rest upon the mere allegations or denials of his pleading, but . . . must set forth specific facts showing that there is a genuine issue

for trial.'" *Id.* at 248 (citations omitted).

Summary judgment is mandated "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp.*, 477 U.S. at 322. "Summary judgment may be granted if the non-moving party's evidence is merely colorable or is not significantly probative." *Sawyer v. Sw. Airlines Co.*, 243 F. Supp. 2d 1257, 1262 (D. Kan. 2003) (citing *Anderson*, 477 U.S. at 250-51).

"[A]t the summary judgment stage the judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson*, 477 U.S. at 249. "Essentially, the inquiry is 'whether the evidence presents a sufficient disagreement to require submission to the jury or whether it is so one-sided that one party must prevail as a matter of law." *Sawyer*, 243 F. Supp. 2d at 1262 (quoting *Anderson*, 477 U.S. at 251-52); *see also LaRoche v. Denny's, Inc.*, 62 F. Supp. 2d 1366, 1371 (S.D. Fla. 1999) ("The law is clear . . . that suspicion, perception, opinion, and belief cannot be used to defeat a motion for summary judgment.").

## IV.     Analysis

Plaintiff's Complaint asserts five claims: (1) Count I – FMLA Interference; (2) Count II – FMLA Retaliation; (3) Count III – Failure to Accommodate under the ADAAA[4]; (4) Count IV –

---

[4] In 2008, Congress amended the ADA pursuant to the ADAAA, which expanded the coverage of the ADA. *See Mazzeo v. Color Resolutions Intern., LLC*, 746 F.3d 1264, 1267 (11th Cir. 2014) (noting that Congress intended for the ADAAA to "lessen the standard of establishing whether an individual has a disability for purposes of coverage under the ADA"). "Because the critical events in this case ... took place after the ADAAA went into effect," the court applies the post-ADAAA version of the ADA. *See Mazzeo*, 746 F.3d at 1267 (noting that the ADAAA became effective on January 1, 2009).

Discriminatory Discipline and Termination on the Basis of Disability; and (5) Count V – ADAAA Retaliation. (Doc. # 1).

In its brief in support of its Motion for Summary Judgment, Defendant argues that it is entitled to summary judgment on each of Plaintiff's claims. In Plaintiff's Response to Defendant's Motion, she has expressly abandoned Count One – her FMLA Interference Claim. (Doc. # 47 at 23, n. 6). However, in her brief in Opposition to Defendant's Motion, Plaintiff has also failed to address her failure to accommodate claims under the ADA. (Doc. # 47 at 23). Plaintiff argues only that her FMLA and ADA retaliation claims and her ADA discrimination claim withstand Defendant's Motion for Summary Judgment. (*Id.*). Therefore, based upon her failure to address that claim in her response, Plaintiff has also abandoned her failure to accommodate claim.[5] *Road Sprinkler Fitters Local Union No. 669 v. Independent Sprinkler Corp*., 10 F.3d 1563, 1568 (11th Cir. 1994) (determining that district court properly treated as abandoned a claim alleged in the complaint but not raised by the plaintiff in opposition to a defendant's motion for summary judgment) (citing *Lazaara v. Howard A. Esser, Inc.*, 802 F.2d 260, 269 (7th Cir. 1986) (holding that a ground not pressed in the district court in opposition to a motion for summary judgment is to be treated by the district court as abandoned.)).

The court addresses Plaintiff's remaining three claims, in turn.

---

[5] Such a claim would be untimely in any event. Plaintiff  barely filed her EEOC charge within 180 days of her termination. (Doc # 1-1). Her failure to accommodate claim was based on conduct occurring months before her termination, in fact months before her leave starting in August 2017. (Doc. # 41-5 at 190-93, 202-04; Doc. # 41-5 at 108-117, 121-122; Doc. # 41-2 at 125-27;  Doc. # 41-2 at 193-94; Doc. # 41-7 at 30).

### A.     FMLA Retaliation

The FMLA provides a right to twelve weeks of medical leave per year "[b]ecause of a serious health condition." 29 U.S.C. § 2612(a)(1)(D). "Although this provision does not expressly speak in terms of retaliation, we have held that it also 'prohibits an employer from retaliating against an employee who attempts to exercise any FMLA-created right.'" *Martin v. Fin. Asset Mgmt. Sys., Inc*., 959 F.3d 1048, 1052 (11th Cir. 2020) (quoting *Walker v. Elmore Cty. Bd. of Educ.*, 379 F.3d 1249, 1250 (11th Cir. 2004)). "To prove FMLA retaliation, an employee must show that h[er] employer intentionally discriminated against h[er] for exercising an FMLA right." *Jones v. Aaron's Inc*., 748 F.App'x. 907, 917 (11th Cir. 2018) (quoting *Martin v. Brevard Cty. Pub. Sch*., 543 F.3d 1261, 1267 (11th Cir. 2008)). "When a plaintiff asserts a claim of retaliation under the FMLA, in the absence of direct evidence of the employer's intent, we apply the same burden-shifting framework established by the Supreme Court in *McDonnell Douglas Corp. v. Green* [] for evaluating Title VII discrimination claims." *Strickland v. Water Works & Sewer Bd. of Birmingham*, 239 F.3d 1199, 1207 (11th Cir. 2001) (citing *Brungart v. BellSouth Telecomm. Inc.*, 231 F.3d 791, 798 (11th Cir. 2000)); *Jones*, 748 F. App'x at 917. "A prima facie case of retaliation under the FMLA requires a showing that (1) the employee engaged in statutorily protected conduct, (2) the employee suffered an adverse employment action, and (3) there is a causal connection between the two." *Krutzig v. Pulte Home Corp*., 602 F.3d 1231, 1234 (11th Cir. 2010) (citing *Smith v. BellSouth Telecomm., Inc*., 273 F.3d 1303, 1314 (11th Cir. 2001)).

Here, there is no dispute that Plaintiff engaged in protected conduct under the FMLA. She requested FMLA leave in both 2016 and 2017. (Doc. # 41-2 at 182-89). The available leave was approved and was exhausted as of May 30, 2017. (Doc. 41-2 at 178-79).

The parties dispute whether all of the actions identified by Plaintiff as retaliatory constitute actionable adverse employment actions. "The Eleventh Circuit has applied the definition of adverse employment action found in the Title VII retaliation conte[x]t." *Burks v. Mobile Cty. Pub. Sch. Sys.*, 2019 WL 1452511, at *4 (S.D. Ala. Apr. 2, 2019) (citing *Jones*, 748 F.App'x at 917); *see also Foshee v. Ascension Health-IS, Inc.*, 384 F.App'x 890, 891 (11th Cir. 2010) (per curiam). "[An] adverse employment action must be material, meaning it must be one that 'could well dissuade a reasonable worker' from engaging in protected activity." *Wood v. Gilman Bldg. Prod. Inc.*, 769 F. App'x 796, 802 (11th Cir. 2019) (quoting *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 57 (2006)) (addressing an FMLA retaliation claim). "Specifically, that 'an employment action is "materially adverse" when it involves a significant harm and might dissuade a reasonable worker from engaging in the protected activity, but material adversity does not include trivial harms, petty slights, or minor annoyances.'" *Id*. (citing *Jones*, 748 F.App'x at 917). Some level of materiality is required "to separate significant from trivial harms." *Id*. "Title VII ... does not set forth 'a general civility code for the American workplace.'" *Id*. (quoting *Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 80 (1998)).

### 1.    Adverse Employment Actions

There is no dispute that Plaintiff suffered an adverse employment action when her employment was terminated on October 30, 2017. (Doc. # 41-5 at 215; Doc. 41-5 at 124; Doc. # 41-3 at 221-22; Doc. 41-2 at 188). Plaintiff, however, argues that she also experienced adverse employment actions for purposes of her FMLA retaliation claim when she was denied extra flat fee work she had been given "prior to her disabilities," when she received disciplinary write-ups, and when she was moved to the 9th floor. (Doc. # 47 at 27). Plaintiff asserts that "collectively"

these actions are sufficient to constitute actional adverse employment actions. But the actions in this case occurred at different times and for different reasons.[6] Thus, they cannot logically be lumped together for purposes of Plaintiff's FMLA retaliation claim.[7] Accordingly, the court will address the actions individually.

### a.      Extra Flat Fee Work

In her declaration, Plaintiff states the following regarding working extra shifts:

> Prior to my requests for accommodations and leaves of absence, I had signed up to work additional shifts for Grandview. When I returned from leave, Ms. Watson took away these extra shifts and gave them to other non-disabled social workers. [I] never again was allowed to work and extra shift.

(Doc. # 48-11 at 13). Plaintiff does not state when she worked these shifts, with what frequency, or when she was denied available shifts. Thus, the court cannot even begin to determine timing for statute of limitations purposes. In Watson's deposition, she explained that the opportunity to work extra shifts was not a frequent occurrence. (Doc. # 41-1 at 174-75). Rather, these opportunities arose around the time the new hospital opened and during the move day and the transition, all of which occurred in 2015. (*Id.*). When Watson received a request from the nursing units, she e-mailed it to her staff and anyone who had time could sign up. (Doc. # 41-1 at 176). The record is devoid of any information regarding a continued need for the extra shift work after the hospital

---

[6] The first write up occurred on March 15, 2017. The second write up occurred over four months later on July 24, 2017. Plaintiff's termination occurred three months after that, on October 30, 2017. Plaintiff has never specified a date when she either received extra shifts or when she was denied available extra shifts.

[7] The court acknowledges that *Akins v. Fulton Cty., Ga.*, 420 F.3d 1293, 1301 (11th Cir. 2005) and *Shannon v. Bellsouth Telecomms., Inc*., 292 F.3d 712, 716 (11th Cir. 2002) (recognizing that a set of actions may constitute an adverse employment action when considered collectively, even though some actions do not rise to the level of an adverse employment action individually) stand for the proposition that courts should evaluate employment actions individually and collectively to determine whether a plaintiff has been subject to an actionable adverse employment action. Here, however, Plaintiff has undisputedly been subject to at least one employment action that is adverse as a matter of law: her termination. Therefore, the court need not resort to the constructive discharge-type analysis utilized in these cases.

transitioned to its new location, or that Plaintiff was ever denied the opportunity on any particular occasion within the limitations period, i.e. after February 2017. (*See* Doc. # 1). Therefore, the failure to obtain further shift work does not rise to the level of an actionable adverse employment action for purposes of Plaintiff's FMLA retaliation claim.

### b. Disciplinary Write-Ups

Defendant issues disciplinary write ups as part of a progressive discipline policy. (Doc. # 41-1 at 163; Doc. # 41-5 at 215, 235-36). Where the seriousness of a disciplinary write-up escalates with the advent of each write up, the write ups are not petty snubs or comments. Plaintiff's second write-up indicates that additional discipline would result in termination. (Doc. # 41-1 at 163). Therefore, these write-ups were not trivial. *See Glass v. Supreme Beverage Co.,* 2012 WL 13048225, at *1 (N.D. Ala. Feb. 3, 2012). As such, the court assumes they constitute actionable adverse employment actions for purposes of Plaintiff's FMLA retaliation claim.

### c. Change in Floor Assignment

After Plaintiff exhausted her FMLA leave, she went on a personal leave of absence starting August 24, 2017 and ending October 24, 2017. When she returned, she was assigned to the ninth, rather than the seventh floor.[8] Plaintiff testified that the ninth floor was the "biggest challenge" for social workers because it was a "med surge" floor. However, she has not presented any evidence that she lost any pay, prestige, or responsibility as a result of this move.

---

[8] Defendant was not required to hold Plaintiff's position for her after the expiration of her FMLA leave. *See* 29 U.S.C. § 2612(a)(1); *see also Johnson v. Vintage Pharmaceuticals*, 185 Fed. Appx. 798, 800 (11th Cir. 2006) (finding that employer did not violate the FMLA by terminating employee, given that employee's 12 workweek FMLA entitlement already was exhausted at the time of her termination).

"[A] transfer can meet the threshold of material adversity 'if it involves a reduction in pay, prestige or responsibility.'" *Sharpe v. Glob. Sec. Int'l*, 766 F. Supp. 2d 1272, 1293 (S.D. Ala. 2011) (quoting *Hinson v. Clinch County, Georgia Bd. of Educ.*, 231 F.3d 821, 829 (11th Cir. 2000)). The undisputed evidence here does not show that Plaintiff lost any pay, prestige, or responsibility when she was transferred from the seventh floor to the ninth floor. Therefore, the court concludes that this move was not an actionable adverse employment action for purposes of Plaintiff's FMLA retaliation claim.

### d.    Termination

The termination of Plaintiff's employment is clearly an actionable adverse employment action. *See Pashoian v. GTE Directories*, 208 F. Supp. 2d 1293, 1304 (M.D. Fla. 2002) ("Plaintiff's termination is sufficient to establish an adverse employment action for the purposes of establishing the second element of his prima facie case for retaliation under the FMLA.").

### 2.    Causal Connection

The parties also dispute whether Plaintiff has presented evidence supporting a causal connection between the exercise of her rights under the FMLA and the adverse employment actions. (Doc. # 40 at 19-21; Doc. # 47 at 23-27). "The causal connection element is satisfied if a plaintiff shows that the protected activity and adverse action were 'not wholly unrelated.'" *Krutzig,* 602 F.3d at 1234 (quoting *Brungart v. BellSouth Telecomm., Inc.*, 231 F.3d 791, 799 (11th Cir. 2000)). A plaintiff can meet this burden by showing "that the decision maker was aware of the protected conduct at the time of the adverse employment action." *Id*. However, "[i]f there is a substantial delay between the protected expression and the adverse action in the absence of other evidence tending to show causation, the complaint of retaliation fails as a matter of law." *Brisk v.*

*Shoreline Found., Inc.*, 654 F.App'x 415, 416 (11th Cir. 2016) (quoting *Higdon v. Jackson*, 393
F.3d 1211, 1221 (11th Cir. 2004)).

### a.   Disciplinary Write-Ups

Plaintiff applied for FLMA in late 2016. She returned from FMLA leave on January 13,
2017. Two months later, on March 15, 2017, she received a written warning for substandard work.

On June 7, 2017, while she was out on leave for ankle surgery, Plaintiff retroactively
requested FMLA leave. Her request was granted in part, but her available FMLA leave was
exhausted as of May 30, 2017. She returned to work on June 19, 2017. She received a second
written warning for substandard work on July 24, 2017.

The Eleventh Circuit has recognized that "a period as much as one month between the
protected expression and the adverse action is not too protracted" to show a causal connection but
that a three to four-month period is insufficient. *Higdon*, 393 F.3d at 1220. Here, both write ups
were signed by Watson, who was aware that Plaintiff had been on FMLA leave. The length of time
between when Plaintiff engaged in protected conduct under the FMLA and when she received the
write ups is not so protracted that the court can say as a matter of law that there is no causal
connection. Therefore, Plaintiff has established a prima facie case of retaliation under the FMLA
with regard to these two disciplinary write ups.

### b.   Termination

Plaintiff exhausted her FMLA leave as of May 30, 2017. The decision to terminate
Plaintiff's employment was made over four months later by Wink, Soekoro, and Mason at an
October 27, 2017 meeting. (Doc. # 41-6 at 69-71, 78-80; Doc. # 41-5 at 235-36). Based on this
timing, Plaintiff argues that she "has established close temporal proximity between protected

conduct and the adverse employment actions." (Doc. # 47 at 16). However, as noted above, a three to four-month period of time is insufficient show a causal connection necessary to establish a prima facie case of FMLA retaliation as to Plaintiff's termination. *Higdon*, 393 F.3d at 1220.

Moreover, no causal connection exists when intervening misconduct caused the adverse employment action. *See Fleming v. Boeing*, 120 F.3d 242, 248 (11th Cir. 1997) (indicating that no causal connection existed based on failure to hire where the applicant failed an essential employment test). Here, Defendant received a complaint from a patient's son regarding Plaintiff's behavior and job performance. Once Plaintiff was alerted to the complaint, she called the patient's son to ask why he was mad at her. This prompted another complaint regarding Plaintiff's conduct, during which the patient's son described Plaintiff's behavior as irrational. Defendant also received a complaint that Plaintiff was discussing her worker's compensation lawsuit against the company during work time. Therefore, for this additional reason, the court concludes that Plaintiff has failed to show a causal connection necessary to establish a prima facie case of FMLA retaliation as to her termination.[9]

### 3.    Defendant's Articulated Reasons

Even assuming that Plaintiff could establish a prima facie case (and, to be clear, she has not), the question becomes whether Defendant has articulated a legitimate reasons for its action and whether Plaintiff can show that reason is a pretext. "If the employee successfully demonstrates a prima facie case of FMLA retaliation, the burden then shifts to the employer to articulate a legitimate reason for the adverse action." *Brisk*, 654 F.App'x at 417 (citing *Strickland v. Water*

---

[9] Out of an abundance of caution, and alternatively, the court will continue its analysis of Plaintiff's termination below.

*Works & Sewer Bd. of Birmingham*, 239 F.3d 1199, 1207 (11th Cir. 2001)). "An employer's reason for an employment decision can be 'a good reason, a bad reason, a reason based on erroneous facts, or ... no reason at all, as long as its action is not for a discriminatory reason.'" *Id.* (quoting *Nix v. WLCY Radio/Rahall Comms.*, 738 F.2d 1181, 1187 (11th Cir. 1984) (abrogated on other grounds by *Lewis v. City of Union City, Georgia*, 918 F.3d 1213 (11th Cir. 2019) (citations omitted)).

### a.  Disciplinary Write-Ups

Defendant issued the March 15, 2017 disciplinary write up based on a complaint from Dr. Murry who perceived that Plaintiff failed to communicate adequately with him and with a family regarding a discharge plan. (Doc. # 41-1 at 235-36; 41-2 at 204).

Defendant issued the July 24, 2017 disciplinary write up based on complaints from the RN Cardiac Unit Director and a nurse practitioner regarding substandard discharge planning by Plaintiff and a lack of documentation regarding a discharge plan that resulted in a delayed discharge. (Doc. # 41-1 at 284-85; Doc. # 41-1 at 164; Doc. # 41-1 at 166).

### b.  Termination

Defendant has articulated legitimate, non-retaliatory reasons for the termination of Plaintiff's employment. Specifically, Rick Smith, a patient's son, complained about Plaintiff's planning for his mother's discharge from the hospital to a nursing facility. (Doc. # 41-9 at ¶ 6; Doc. # 41-10 ¶ 6). Smith informed Perrigin, the Charge Nurse on the 9th floor, that Plaintiff was not focusing on his mother's situation, but instead was talking about herself, her medical problems, and her problems with Grandview. (Doc. # 41-9 at ¶ 6). Smith told Perrigin he did not want to deal with Plaintiff anymore. (*Id.*). Perrigin reported the incident to Dean. (Doc. # 41-10 at  ¶ 6).

Dean then spoke with Smith, who told Dean that: (1) Plaintiff did not seem concerned about his mother, but instead told him about her personal medical issues; (2) of the 30 minutes Plaintiff had spent in his mother's room, she had spent 25 of those minutes talking about herself and her medical problems; and (3) he did not feel that Plaintiff had listened to anything he said concerning his mother's situation because she was bust discussing her personal life, including her health issues. (Doc. # 41-10 at ¶¶ 6-7, p. 6). Dean reported this information to Colvert, who in turn reported it to Soekoro.

Dean also reported to Colvert, Callis, and Soekoro that Plaintiff was "sharing with staff that she has law suits against the hospital," that "the hospital tried to get rid of her and that she got kicked off 7th floor because they didn't like her." (Doc. # 41-10 at ¶ 9, p. 7; Doc. # 41-6 at 69-71; Doc. # 41-6 at 50). Dean explained that Plaintiff had shared this information with him and with his staff, which he found "very concerning". (*Id.*).

Plaintiff had already received a second written warning, so the next disciplinary step under Defendant's policies was termination. (Doc. # 41-1 at 163; Doc. # 41-1 at 215, 235-36).

### 4.    Pretext

"Once an employer articulates a legitimate non-discriminatory reason, the employee then must show that the employer's proffered reason was pretextual." *Brisk*, 654 F.App'x at 417 (citing *Strickland*, 239 F.3d at 1207). "Pretext is only proven if it is shown both that the reason was false, and that discrimination or retaliation was the real reason behind the challenged action." *Id.* (citing *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 515 (1993)). The plaintiff "is not allowed to recast an employer's proffered nondiscriminatory reasons or substitute [her] business judgment for that of the employer." *Chapman v. AI Transp.*, 229 F.3d 1012, 1030 (11th Cir. 2000). "Provided that

the proffered reason is one that might motivate a reasonable employer, an employee must meet that reason head on and rebut it, and the employee cannot succeed by simply quarreling with the wisdom of that reason." *Id.*; *see also Alvarez v. Royal Atl. Developers, Inc.*, 610 F.3d 1253, 1265-66 (11th Cir. 2010). To show that a defendant's articulated reasons are pretextual, a plaintiff must "demonstrate[ ] such weaknesses, implausibilities, incoherencies, or contradictions in [the defendant]'s proffered legitimate reasons for its action that a reasonable factfinder could find them unworthy of credence." *Hornsby-Culpepper v. Ware*, 906 F.3d 1302, 1312 (11th Cir. 2018) (quoting *Jackson v. State of Ala. State Tenure Comm'n*, 405 F.3d 1276, 1289 (11th Cir. 2005)). "'The heart of the pretext inquiry is not whether the employee agrees with the reasons that the employer gives for the discharge, but whether the employer really was motivated by those reasons.'" *Lee v. Addiction & Mental Health Servs., LLC*, 2020 WL 4284050, at *8 (N.D. Ala. July 27, 2020) (quoting *Standard v. A.B.E.L. Serv., Inc.*, 161 F.3d 1318, 1333 (11th Cir. 1998)).

Interestingly, Plaintiff does not either individually address the particular employment actions at issue in this case, or separate out her analysis of her FMLA and ADA claims. She merely argues that "the record is replete with evidence that Watson, Colvert and [Plaintiff's] work colleagues were frustrated and angry that [Plaintiff] was taking so much leave from work due to her disabilities" and that "all of the formal discipline was given to [her] after she took protected activity." (Doc. # 47 at 30). And, although she asserts that there are "inconsistencies and contradictions with respect to [Defendant's] proffered reasons for terminating [Plaintiff,]" (Doc. # 47 at 31), she has not specified what those inconsistencies and contradictions are. Therefore, she has utterly failed to meet her burden of establishing that Defendants reasons for her discipline and termination were pretextual.

In fact, as to her termination. Plaintiff has not disputed any of the facts set forth by Defendant regarding the reasons for her termination. (*Compare* Doc. # 40 at 11-15 *with* Doc. # 47 at 4). She has provided no Rule 56 evidence indicating that the doctor, nurse practitioner and patient complaints about her on which her discipline and termination were based either were not made, or that Defendant did not rely upon those complaints in good faith. Moreover, the colleagues who Plaintiff identified as being frustrated with the amount of leave she took were not involved in the decision to terminate Plaintiff's employment.[10]

Plaintiff has failed to meet Defendant's reasons head on and rebut them. Rather, she simply quarrels with Defendant's reasons. As such, Plaintiff has failed to show that Defendant's articulated reasons were false and that the real reason for the disciplinary write ups and her termination was retaliation for her FMLA leave. *See* Chapman, 229 F.3d at 1030. Therefore, Defendant is entitled to summary judgment on Plaintiff's FMLA retaliation claim.

### B.     Disability Discrimination and Retaliation

The court begins its analysis by noting that the Americans with Disabilities Act of 2008 ("ADAAA") was designed to expand the number of persons covered by our nation's law protecting disabled persons by expanding the definition of the term "disability." "Despite the changes brought about by the ADAAA, courts still utilize the same *McDonnell Douglas* burden-shifting analysis used in ADA and Title VII cases." *Beatty v. Hudco Indus. Prods., Inc.*, 881 F. Supp. 2d 1344, 1351 (N.D. Ala. 2012). The only adverse employment action for which Plaintiff's EEOC charge

---

[10] To be sure, when, on July 25, 2017, Colvert and Watson privately expressed their frustration with Plaintiff's continued absences from work, Plaintiff's absences were no longer protected under the FMLA because her FMLA leave had been exhausted as of May 30, 2017. Moreover, "[i]f an employee needs leave intermittently or on a reduced leave schedule for planned medical treatment, then the employee must make a reasonable effort to schedule the treatment so as not to disrupt unduly the employer's operations." 29 C.F.R. § 825.203

asserting disability discrimination and retaliation was timely is her termination, which occurred on October 30, 2017. Her EEOC charge was filed 178 days after her termination, on April 26, 2018. (Doc. # 1-1). Because the same adverse employment action is at issue in both of Plaintiff's disability claims, and the same framework applies, the court will consider the claims together.

### 1.    Prima Facie Case

In order to establish a prima facie case of discrimination under the ADAAA, the plaintiff must show that she: (1) had a disability; (2) was otherwise qualified to perform the job; and (3) was discriminated against based on her disability. *Lewis v. City of Union City, Georgia*, 934 F.3d 1169, 1179 (11th Cir. 2019); *Mazzeo v. Color Resolutions Int'l, LLC*, 746 F.3d 1264, 1268 (11th Cir. 2014).

In order to establish a prima facie case of retaliation under the ADAAA, a plaintiff must show that: (1) she engaged in a statutorily protected expression; (2) she suffered an adverse employment action; and (3) there was a causal link between the adverse action and her protected expression. *Frazier-White v. Gee*, 818 F.3d 1249, 1258 (11th Cir. 2016).

Plaintiff suffered from a number of conditions that constitute disabilities under the ADAAA. The ADAAA regulations provide that the term "substantially limits" "shall be construed broadly in favor of expansive coverage" and "is not meant to be a demanding standard." 29 C.F.R. § 1630.2(j)(1)(i). "And courts have held in post-ADAAA cases that temporary injuries may qualify as disabilities." *Dykstra v. Fla. Foreclosure Attorneys, PLLC*, 183 F. Supp. 3d 1222, 1230 (S.D. Fla. 2016) (citing *Summers v. Altarum Inst., Corp*., 740 F.3d 325, 333 (4th Cir.2014); *Hodges v. D.C.*, 959 F.Supp.2d 148, 154 (D.D.C.2013); 29 C.F.R. § 1630.2(j)(1)(ix)).

Plaintiff is partially deaf, and she suffered from C-Diff. Plaintiff fell and hurt her ankle at work in March 2017. Due to this injury, she was initially prescribed physical therapy. However, she had surgery on her ankle in May 2017. In August 2017, she had a second surgery on her ankle and was out on leave until October 24, 2017. Shortly after she returned from that leave, Plaintiff's employment was terminated. Under these facts, the court concludes that Plaintiff has presented sufficient evidence to establish a prima facie case on both her ADA discrimination and retaliation claims.

### 2.    Articulated Reason and Pretext

"If the plaintiff meets [her] prima facie burden, and the defendant presents a legitimate, nondiscriminatory reason for its actions, the plaintiff may then demonstrate that the reason given was a pretext for disability discrimination" or retaliation. *Ward v. UPS*, 580 F.App'x. 735, 740 (11th Cir. 2014). As discussed above, Defendant articulated legitimate, non-discriminatory and non-retaliatory reasons for Plaintiff's termination. Plaintiff's disciplinary write ups and her eventual termination were all based on complaints from a doctor, from a nurse practitioner, and from a patient's son regarding her work performance. Plaintiff has not come close to disputing the facts on which her termination were based and, for the reasons discussed in detail above, she failed to establish that Defendant's articulated reasons are pretextual. Therefore, Defendant is entitled to summary judgment on Plaintiff's disability claims.

### V.    Conclusion

For all the reasons discussed above, Defendant's Motion for Summary Judgment (Doc. # 39) is due to be granted. A separate order will be entered.

**DONE** and **ORDERED** this October 16, 2020.

**R. DAVID PROCTOR**
UNITED STATES DISTRICT JUDGE